# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DEBORAH LOTT, | : | |
| Plaintiff, | : | Case No. 3:12cv00422 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Beginning on May 31, 2008, Plaintiff Deborah Lott's health problems – a back injury and pain, arthritis, osteoporosis, and asthma – interfered with her ability to perform work. She consequently stopped working her clerical job and later filed an application with the Social Security Administration seeking Disability Insurance Benefits. In support of her application, Plaintiff asserted that she stopped working and could no longer work due to her disability. She further asserted that she had been under a benefits-qualifying "disability" since May 31, 2008.

After initial administrative proceedings, Administrative Law Judge Carol K.

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Bowen denied Plaintiff's application based on the conclusion that Plaintiff's health problems did not constitute a "disability" within the meaning of the Social Security Act. (Doc. #6, PageID at 65-78). The nondisability determination and resulting denial of Plaintiff's application for benefits became the final decision of the Social Security Administration. This Court has jurisdiction to review that final nondisability decision. *See* 42 U.S.C. §405(g).

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. # 11), the administrative record (Doc. # 6), and the record as a whole.

## II.   Disability Insurance Benefits and "Disability" Defined

The Social Security Act provides Disability Insurance Benefits to "persons who have contributed to the [Disability Insurance] program and who suffer from a mental or physical disability." *Bowen v. City of New York*, 476 U.S. 467, 470, 106 S.Ct. 2022, 2024 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – *i.e.,* "substantial gainful activity," in Social Security lexicon.[2] 42

---

[2] The impairment must also be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423.

U.S.C. §423(d)(1)(A); *see Bowen*, 476 U.S. at 469-70.

## III.  **Background**

### A.  **Plaintiff's Vocational Profile and Testimony**

Plaintiff was age 55 on her date last insured and was thus considered an individual "closely approaching advanced age" for purposes of resolving her application for benefits. *See* 20 C.F.R. §404.1563(d). Plaintiff has an Associate's Degree in Business Administration, and she has worked in credit collection, real estate, and trucking. (Doc. #6, PageID at 88, 230, 234).

During an administrative hearing held by Administrative Law Judge Bowen, Plaintiff explained that her last job was clerical; her duties involved working on a computer, performing credit checks, and typing all day.  *Id*., PageID at 100-01. Before that, she worked as a real estate agent, showing homes, walking through yards, and climbing stairs. She also worked as a restaurant manager, which included cooking, waitressing, and washing dishes. *Id*., PageID at 101.

Plaintiff testified that she was 5'2" tall and weighed 180 pounds. *Id*., PageID at 87. She had not worked or looked for work since May 2008.

The Administrative Law Judge asked Plaintiff, "just generally, what are the issues that you feel would interfere with any kind of work at this point?" (Doc. #6, PageID at 89). Plaintiff stated that she has a lot of pain in her back and down her legs, more in her left leg than her right. She explained, "I have three slipped discs in my back. And arthritis

and gout in my hands and feet. And carpal tunnel in my wrist. And I have what [eye specialist] Dr. Miller described as 'wet eye,' from the steroids that I've taken." *Id*.

Plaintiff rated her back/leg pain level to be constantly a 9, on a scale of 1 to 10 (with 10 equaling the worst pain). *Id*., PageID at 91. With medication, her pain levels go down to 5 or 6. *Id*. She does not do a lot of activities. She explained, "if I walk very long, then the sciatic nerve kind of kicks in ...." *Id*. She can walk for about 10 minutes at a time, then she feels pain all the way down her left leg as well as pain from her back. *Id*., PageID at 96-97. She cannot stand in one place for very long because her left leg "gives way." *Id*., PageID at 97. She cannot sit for very long. For example, she cannot sit through a TV show. She is limited to two-hand lifting or carrying the weight of a gallon of milk; she drops heavier items. *Id*., PageID at 97. She does not open jars because of her hand problems. *Id*., PageID at 99.

Plaintiff testified that she saw spots in her left eye, which affect her ability to read. (Doc. #6, PageID at 99). She said she cannot read printing on the computer and uses a magnifying glass for small print. *Id*.

Plaintiff explained that during typical day, "I get up. And ... I'll make my bed. And – if I have laundry to do, then that's what I do. I do the load of laundry and then I'm done for the day. And so, I either sit, or stand, or lay down the rest of the time. I'll try to get a supper in. If I'm not able to hold the pots and pans, then my husband will go out and get us something ... for supper." *Id*., PageID at 91-92. Plaintiff takes naps during most days

4

for about an hour. She does not have trouble bathing or dressing. She vacuums

occasionally but mostly her husband does the vacuuming. She helps her daughter get

ready for school (her daughter takes the bus to school). She sees her 34-year old daughter

and her grandchildren weekly and her friends monthly. She goes out to eat weekly and

goes to movies about once a year.  She said she is not involved in any social groups. She

has a hard time reading due to vision problems. She takes her daughter to 4-H meetings.

She lives on a farm with her husband and younger daughter but does not take care of the

animals. After 2008, she went on a trip to Florida.  (Doc. #6, PageID at 91-96).

Plaintiff testified that she uses an inhaler for her breathing problems, and she takes

all prescribed medication. *Id*., PageID at 90. She said that if she takes an entire pain pill,

then she is "kind of worthless the rest of the day." *Id*.

### B.    Dr. Byers and Three Other Medical Sources

Plaintiff relies on the opinions of her family practice physician, Richard Byers,

M.D., who has treated Plaintiff since December 1997. (Doc. #6, PageID at 334). In March

2009, Dr. Byers submitted a teledictation report to the Ohio Bureau of Disability

Determination stating that Plaintiff's diagnoses consisted of fibrosystic breast disease,

asthma, right L5 radiculopathy, lumber osteopenia, pulmonary hypertension,

diverticulitis, and colonic polyps. *Id*. He noted that severe back pain prevented her from

continuing in the last job she had attempted to work. He further noted, "Unfortunately,

she had a recent fall creating increased pain and tenderness in her back and ribs." *Id*.

Dr. Byers explained that recent studies showed some questionable fibrosis in her lungs and diffuse degenerative disease in her dorsal spine. Bone-density testing revealed osteopenia. Electrocardiogram demonstrated "some chronic ST and T-wave changes in the lateral leads." *Id*. Dr. Byers also wrote, "At this moment, physically, she finds it very difficult to move, lift, etc.... At this moment, she certainly cannot continue to do any type of lifting or work, etc." (Doc. #6, PageID at 335).

In January 2011, Dr. Byers completed a Medical Assessment of Ability to do Work-Related Activities (Physical). He opined that based on examination findings, EMG (electromyogram), and x-ray results, Plaintiff could lift/carry up to 20 pounds occasionally and 10 pounds frequently; stand/walk for 2 to 3 hours out of 8, uninterrupted for 1 to 2 hours; could never to stoop, crouch, kneel, or crawl; could occasionally climb and balance. Her ability to push/pull was limited by her pain but she had no restrictions on her ability to sit. Dr. Byers concluded that Plaintiff could perform sedentary work. (Doc. #6, PageID at 379-83).

In April 2011, Dr. Byers answered written interrogatories regarding Plaintiff's mental impairment on her behalf. (Doc. #6, PageID at 427-36). Dr. Byers found Plaintiff "relatively stoic" regarding her ability to cope with pain. He checked a "no" answer to whether Plaintiff could "complete a normal workday or workweek without interruption from psychologically based and/or physically based symptoms and perform at a consistent pace without unreasonable numbers and lengths of rest periods." *Id*., PageID at 433. Dr.

6

Byers opined that Plaintiff had marked restriction in her daily activities; no difficulties in maintaining social functioning; and no "deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)." *Id*., PageID at 435.

Three non-treating physicians reviewed the record at the request of the Ohio Bureau of Disability Determinations: Dr. Villanueva, Dr. Morton, and Dr. Congbalay. Both Dr. Villanueva and Dr. Morton opined (in July and August 2009, respectively) that Plaintiff could perform medium work. (Doc. #6, PageId at 343, 350). Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." 20 C.F.R. §404.1567(c). Dr. Congbalay reviewed the record in January 2010 and affirmed the initial Residual Functional Capacity as Plaintiff's date last insured. (Doc. #6, PageID at 357-58).

## IV.  Administrative Review

### A.  The Sequential Evaluation

Social Security Regulations require Administrative Law Judges (ALJs) to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). A dispositive finding at any Step terminates the ALJ's review. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The complete sequential review answers five questions:

1.  Has the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?[3]

5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.    ALJ Bowen's Decision**

The ALJ concluded the following at each step of her sequential analysis:

Step One:    Plaintiff had not engaged in substantial gainful activity.

Step Two:    Plaintiff had the severe impairments of lumbar and mild thoracic degenerative disc disease; obesity; osteopenia; and chronic asthma/chronic obstructive pulmonary disease. The ALJ also determined, "The claimant's primary impairment and the source of many of her underlying problems is obesity at a height of 62 inches and weight of 180 pounds. The claimant's obesity acts to aggravate symptoms of her other documented impairments." (Doc. 6, PageID at 69).

The ALJ also determined that Plaintiff's high blood pressure, gastrointestinal issues, hand issues, and eyesight problems arose well after her date last insured or caused "no functional limitations and [were] ... not

---

[3] A person's "residual functional capacity" is an assessment of the most a person can do in a work setting despite his or her limitations. 20 C.F.R. §404.1545(a). A person's work setting requires work on a "regular and continuing basis," meaning 8 hours a day for 5 days a week. Social Security Ruling 96-8p at *1 1996 WL 374184; *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

8

'severe' withing the meaning of the Social Security Act." *Id*., PageID at 70.

Step Three:    Plaintiff did not have an impairment or combination of impairments that met or equaled one of the Commissioner's Listing of Impairments.

Step Four:    Plaintiff retained the Residual Functional Capacity to perform light work[4] with the following additional limitations: "occasional stooping; limited to frequent kneeling, crouching, and crawling; and avoid concentrated exposure to chemicals and other irritants such as fumes, odors, dust, gases, or poorly ventilated areas." *Id*., PageID at 71. Given these abilities and limitations, Plaintiff was capable of performing her past relevant work as a credit clerk, accounts payable clerk, and cashier. *Id*. PageID at 76.

Step Five:    Plaintiff was capable of performing as many as 4,000 jobs at the sedentary level of exertion in the regional area, such as a personnel clerk, receptionist, time keeper, and billing clerk. *Id*., PageID at 77.

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability at any time from May 31, 2008, her claimed disability onset date, through March 31, 2009, her last insured.

## V.    <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Sec*., 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record

---

[4] Social Security Regulations describe light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec*., 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

## VI.    **Discussion**

### A.    **Plaintiff's Disability Insured Status**

As its name suggests, the Disability Insurance Program is designed to provide insurance benefits to those under a disability who have gained insured status under the Program. Insured status is gained by working long enough, and thus contributing enough to the Program, to satisfy specific requirements detailed by regulation. *See, e.g.,* 20 C.F.R. §§404.110, 404.120, 404.130-32, 404.315(a)(1). A person who is "neither fully nor currently insured..." on his or her disability onset date is not eligible to receive Disability

Insurance Benefits. 20 C.F.R. §§404.101(a), 404.131; *see Richardson v. Heckler*, 750

F.2d 506, 509 (6th Cir. 1984).

In the instant case, Plaintiff's work and earnings over the years qualified her for

insured status under the Disability Insurance Program through March 31, 2009. She must

therefore show she was under a benefits-qualifying on or before March 31, 2009. *See*

*Richardson*, 750 F.2d at 509. Ultimately, then, Plaintiff must show that she was under a

disability during the ten-month period between that the date she claims her disability

began and her date last insured – May 31, 2008 to March 31, 2009.

### B. <u>Medical Source Opinions</u>

**1.**

Plaintiff contends that although the ALJ properly rejected the opinions of the non-

treating physicians (Drs. Villanueva, Morton, and Congbalay), the ALJ erred by rejecting

the opinions of her treating physician, Dr. Byers. Plaintiff maintains that the ALJ's

decision was not based on any medical opinion and was flawed because the ALJ assumed

the role of a medical doctor.

The Commissioner argues that Plaintiff has not shown she was disabled during the

relevant ten-month period – May 31, 2008 to March 31, 2009. The Commissioner also

argues that the ALJ properly rejected Dr. Byers' opinion due to the absence of diagnostic

testing the showed more than minor abnormalities, especially before March 2009.

**2.**

Social security regulations recognize several different categories of medical

sources: treating physicians, nontreating yet examining physicians, and nontreating yet

record-reviewing physicians. *Gayheart v. Comm'r Social Sec*., 710 F.3d 365, 375 (6th

Cir. 2013).

> As a general matter, an opinion from a medical source who has
> examined a claimant is given more weight than that from a source who has
> not performed an examination (a "nonexamining source"), and an opinion
> from a medical source who regularly treats the claimant (a "treating
> source") is afforded more weight than that from a source who has examined
> the claimant but does not have an ongoing treatment relationship (a
> "nontreating source"). In other words, "[t]he regulations provide
> progressively more rigorous tests for weighing opinions as the ties between
> the source of the opinion and the individual become weaker."  Soc. Sec.
> Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (d) (eff. April

1, 2012)).

A treating source's opinion may be given controlling weight under the treating-

physician rule only if it is both well supported by medically acceptable data and not

inconsistent with other substantial evidence of record. *Gayheart*, 710 F.3d  at 376; *see* 20

C.F.R. §404.1527(d)(2) (eff. April 1, 2011). "If the Commissioner does not give a

treating-source opinion controlling weight, then the opinion is weighed based on the

length, frequency, nature, and extent of the treatment relationship, as well as the treating

source's area of specialty and the degree to which the opinion is consistent with the

record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376

(citing 20 C.F.R. § 404.1527(c)(2)-(6) (eff. April 1, 2012).

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id*. (citing 20 C.F.R. §404.1527(c)(6) (eff. April 1, 2012)).

ALJ Bowen declined to give Dr. Byers' opinions controlling or deferential weight. (Doc. #6, PageID at 72). The ALJ explained:

> [Dr. Byers'] conclusions are neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with the other substantial evidence in the case record.... There are no diagnostic tests or affirmative clinical findings that are consistent with the limitations imposed by Dr. Byers. Both lumbar and thoracic x-rays showed no more than "mild" degenerative changes. Pulmonary function studies showed only mild disease with normal oxygen saturation and preserved flow rate and capacity. Furthermore, the doctor's opinion is based, at least in part, on an assessment of impairments outside his area of expertise. He is not an orthopedist, neurologist, or pulmonologist, physicians whose opinions would be more persuasive. Moreover, the March 2009 opinion was rendered after the claimant fell and stated, "[A]t this moment" she could not work. While that statement could have been accurate for a short period of time while she recovered, there is no evidence that the contusion across her back persisted for 12 months, as is required (20 CFR 404.1505), and objective findings do not support the idea that the claimant cannot perform work at any level of exertion. Finally, [Dr. Byers'] January 2011 opinion was rendered well after the claimant's date last insured for Title II benefits and, therefore, is inapplicable to this decision....

13

(Doc. #6, PageID at 72).

**3.**

The ALJ applied the correct legal criteria to her evaluation of Dr. Byers' opinions. She considered whether controlling weight must be given to Dr. Byers' opinions under the treating physician rule consistent with the standards set by the Regulations, 20 C.F.R. §404.1527(d)(2), and case law. *See Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The ALJ then continued to weigh Dr. Byers' opinions under several applicable regulatory factors – specifically, "supportability," "consistency," and "specialization" – to determine whether any weight was due Dr. Byers' opinions. *See* 20 C.F.R. §404.1527(d)(2)-(5); *see also Wilson*, 378 F.3d at 544. The ALJ examined the supportability and consistency factors by considering the mild results of x-ray exams and pulmonary-function studies. (Doc. #6, PageID at 72). She applied the specialization factor when observing that Dr. Byers was not a neurologist, orthopedist, or pulmonologist and by noting that such specialists' opinions "would be more persuasive." *Id*. By evaluating Dr. Byers' opinions in this manner, under the treating physician rule and several of the remaining regulatory factors, the ALJ applied the correct legal criteria.

Substantial evidence supports the ALJ's reasons for discounting the opinions Dr. Byers provided in March 2009. His report contains a list of Plaintiff's diagnoses but no explanation or information tying any one (or more) diagnosis to Dr. Byers' opinion that Plaintiff could not perform any substantial work or to support his later opinion (in 2011)

14

that she could perform only limited sedentary work. Similarly, the text of Dr. Byers'
March 2009 report merely reviewed the results of Plaintiff's "recent studies" without
illuminating which, if any, test results supported Dr. Byers' non-work or limited-
sedentary work opinions. *See* Doc. #6, PageID at 334-35.

Dr. Byers' March 2009 report also contains a list of Plaintiff's medications –
Evista, Zegrid, Albuterol, Aspirin, Folic Acid – and indicates that Plaintiff also takes
Vitamin D and Calcium. *Id.*, PageID at 335. But Dr. Byers does not mention any side
effects from these medications or discuss whether the medications impact her ability to
perform work. Lastly, Dr. Byers stated in his March 2009 report,"At this moment,
physically, she finds it very difficult to move, lift, etc.... At this moment, she certainly
cannot continue to do any type of lifting or work, etc." (Doc. #6, PageID at 335). The
ALJ reasonably read Dr. Byers' use of the phrase "At this moment" to qualify his opinion
to a short period of time near the date Dr. Byers' opined that Plaintiff cannot perform
lifting or work. The ALJ then reasonably concluded that Dr. Byers' "At the moment"
qualification might have been accurate for a short time but did not support the conclusion
that Plaintiff was precluded from work for 12 months, as both the Social Security Act and
Regulations require. *See* 42 U.S.C. §423; 20 C.F.R. §404.1505. And Dr. Byers did not
provide any information or statement to indicate that he believed Plaintiff's then-present
inability to work had lasted, or would last, for at least 12 months. *See* Doc. #6, PageID at
334-35.

A review of Plaintiff's lumbar and thoracic x-ray or imaging reports confirm the ALJ's view that no more than "mild" degenerative changes were present. *See, e.g, id*., PageID at 318-19, 338, 340. Similar confirmation arises from a review of Plaintiff's pulmonary studies, which showed only mild disease, as the ALJ recognized. *See, e.g, id*., PageId at 337.

The ALJ's observation that Dr. Byers is not a specialist, such as a neurologist or orthopedist or pulmonologist, is not contradicted by any evidence of record and is consistent with Dr. Byers' notation that he practices family medicine. (Doc. #6, PageID at 427). Although Dr. Byers also noted "Geriatrics" as a professional qualification, *id*., he did not indicate that he holds certification by the American Board of Internal Medicine in "Geriatric Medicine." (Doc. #6, PageID at 427). And, given the lack of objective evidence and explanation in support of Dr. Byers' opinions, any expertise he had in Geriatric Medicine did little, if anything, to validate his opinions about Plaintiff's work limitations. This is especially so when he did not explain his opinions and when certain, more pertinent specializations identified by the ALJ such as neurology or orthopedics would have been "more persuasive." (Doc. #6, PageID at 72).

In Dr. Byers' January 2011 medical assessment, he did not explain his opinion that Plaintiff could perform only sedentary work; he merely checked an answer corresponding to that limitation. *See* Doc. #6, PageID at 383. Dr. Byers' likewise provided no explanation of his opinions regarding Plaitniff's lifting/carrying limitations,

16

standing/walking limitations, and postural limitations. *Id*., PageID at 379-81. Dr. Byers noted that he relied on his examination of Plaintiff and her pain as well as EMG and x-rays, and radiographs, but he did not point to specific examination or test results in explanation of, or to support, his opinions. This leaves Dr. Byers' opinions conclusory, not "well-supported" by clinical and diagnostic test results, and not well-explained. As the Regulations state, "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion...." 20 C.F.R. §404.1527(d)(3).

For all the above reasons, the ALJ applied the correct legal criteria to evaluate Dr. Byers' opinions and substantial evidence supported the ALJ's reasons for rejecting Dr. Byers' opinions.

## 4.

Plaintiff contends that the ALJ erred by finding that she did not have a severe hand impairment. She argues, "There is no support for the ALJ's finding that Plaintiff could have used her fingers to perform the typing tasks and other manipulative activities required by her past relevant work as a credit clerk, accounts payable, or cashier." (Doc. #7, PageID at 446). The ALJ correctly determined that the record lacks showing that Plaintiff suffered a severe hand impairment during the pertinent ten-month time period – May 31, 2008 to March 31, 2009. Plaintiff was diagnosed with bilateral carpel tunnel

17

syndrome in March 2011, well after the pertinent time period. Because this is the first significant mention in the record of Plaintiff's hand problems, the ALJ reasonably concluded that Plaintiff did not suffer from a severe hand impairment before March 31, 2009. *Cf. Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (report written eight months after expiration of insured status was "minimally probative" of her condition before her date last insured). The ALJ, moreover, did not err in rejecting Plaintiff's testimony about her hand restrictions, as explained below. *Infra*, § VI(C).

Next, relying on *Gayheart*, 710 F.3d 365, 376-77, Plaintiff argues, "the ALJ failed to identify the substantial evidence that was inconsistent with the opinions of the treating physicians except for the opinions of State agency reviewers." *See* Doc. #7 at PageID at 445. Plaintiff's reliance on *Gayheart* is misplaced for two reasons. First, the ALJ's misstep in *Gayheart*, was that he "does not identify the substantial evidence that is purportedly inconsistent with [the treating physician's] opinions. Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors." 710 F.3d at 377. Here, unlike in *Gayheart*, the ALJ did not rely on, solely or otherwise, the record-reviewing physicians' opinions to reject Dr. Byers' opinions. *See* Doc. #6, PageID at 72. Instead, the ALJ based her rejection on reasons permitted by the Regulations and case law, and substantial evidence supported those reasons, as explained above. *Supra*, §VI(B)(3).

Second, in contrast to *Gayheart*, the ALJ in the present case rejected both the

opinions of the record reviewers and the opinions of treating physician Dr. Byers. Because of this, the ALJ did commit the *Gayheart* error – *i.e*., applying "greater scrutiny to treating-physician opinion as a means of giving such opinion little weight." *Id*. at 380. Here, the ALJ did not credit the nontreating physicians' opinions and did not err by applying less scrutiny to their opinions and more scrutiny to Dr. Byers' opinions. *See* Doc. #6, PageID at 71-73.

Accordingly, for all the above reasons, Plaintiff's first assignment of errors lack merit.

### C. Credibility

Plaintiff argues that the ALJ erred in finding her statements of disabling pain not credible. She points to the ALJ's finding that she suffers from the severe impairments of "lumbar and mild thoracic degenerative disease; obesity; osteopenia; and asthma/chronic obstructive pulmonary disease." (Doc. #7, PageID at 450)(quoting Doc. #6, PageID at 69). She further argues that the ALJ erred in relying on her level of daily activities and by not indicating how Plaintiff's activities show she could "perform work activity for eight hours a day, five days a week, fifty[-]two weeks a years as required by the Social Security Act." (Doc. #7, PageID at 451)(relying on Social Sec. Ruling 96-8p).

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 475 (citing, in part, *Walters v. Comm'r of Soc. Sec.,* 127

19

F.3d 525, 531 (6th Cir.1997) (other citation omitted). Still, "[t]here is no question that subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) (citations omitted).

In the present case, the objective medical evidence establishes that Plaintiff has the severe impairments Plaintiff relies on, which correspond to the severe impairment the ALJ identified at step two of her sequential evaluation – again, "lumbar and mild thoracic degenerative disease; obesity; osteopenia; and asthma/chronic obstructive pulmonary disease." (Doc. #6, PageID at 69). But the fact that the ALJ identified these severe impairments, without more, is not conclusive and may have little probative value as to Plaintiff's credibility because of the very low evidentiary hurdle applicable at step two. Review of an impairment's severity at step two involves "a *de minimis* hurdle in the disability determination process.... Under the ... *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). By definition, then, the severity of Plaintiff's step-two impairments – being just "slight abnormalities that minimally affect [her] work ability," *id.*, without more, say little about Plaintiff's credibility.

Plaintiff's better credibility argument focuses on the ALJ's reliance of Plaintiff's daily activities as a basis for discounting her credibility. She faces, however, a difficult

20

task in challenging the ALJ's credibility findings on this basis for two main reasons. First, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Second, "[t]he absence of sufficient objective medical evidence makes credibility a particularly relevant issue, and in such circumstances, this court will generally defer to the Commissioner's assessment when it is supported by an adequate basis. *Id*. (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990)).

As discussed above, *supra*, §VI(B)(3), much of the evidence of record showed that although Plaintiff had some notable health problems, the objective studies and examination results during the relevant ten-month time period (before her date last insured) revealed in mild or minimally abnormal findings. In addition, the ALJ's credibility evaluation is based upon substantial evidence of record. Specifically, the ALJ cited a variety of evidence to support her conclusions – including the results from March 2009 x-rays of Plaintiff's dorsal spine which showed only "mild" hypertrophic degenerative changes to her dorsal spine with intervertebral disk space narrowing and no nerve root compression. The record shows, and the ALJ correctly noted, that Plaintiff's treatment has been essentially routine or conservative in nature. She never sought or received treatment from an orthopedist or neurologist for her complaints of back pain and

has had no surgery.

Plaintiff's argument about the ALJ's reliance on her daily activities is unsupported by the record and hearing transcript. Plaintiff walks without the need for any assistive device. (Doc. #6, PageID at 73, 96). Furthermore, the evidence of record shows that Plaintiff is able to keep her respiratory condition under control with inhalers. (Doc. #6, PageID at 73, 90). As the ALJ pointed out, Plaintiff "stopped taking several of her asthma medications without her doctor's approval, suggesting that her symptoms may not have been as limiting as alleged." (Doc. #6, PageID at 75; *see* 20 C.F.R. § 404.1530(a) (In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.)).

Turning to Plaintiff's lower back pain, the ALJ properly considered Plaintiff's testimony about her activities in caring for her daughter, performing her own hygiene, cooking, cleaning, driving, and shopping. (Doc. #6, PageID at 73 (citing PageID at 91-95)). Although Plaintiff's testimony about these activities was not informative concerning her ability to sustain a work activity on a sustained basis, eight hours a day, five days a week, her testimony about these activities was equally consistent with her ability to perform a limited range of light work, as the ALJ found. In these circumstances, and in light of the minimal objective evidence concerning her health problems and work abilities during the relevant ten-month time period, the ALJ's credibility determination is entitled to deference.

22

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability determination be affirmed; and

2.      The case be terminated on the docket of this Court.


November 8, 2013

                                   _____s/Sharon L. Ovington_____
                                        Sharon L. Ovington
                                Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).